IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

WARREN R. SIMS,               )
                              )
          Plaintiff,          )
                              )
    v.                        )   Case No.
                              )   07-4085-CV-C-REL-SSA
MICHAEL J. ASTRUE, Commissioner )
of Social Security,           )
                              )
          Defendant.          )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Warren Sims seeks review of the final decision of
the Commissioner of Social Security denying plaintiff's
application for disability benefits under Titles II and XVI of
the Social Security Act ("the Act"). Plaintiff argues that the
ALJ improperly evaluated plaintiff's credibility with regard to
swelling in his lower legs. I find that the substantial evidence
in the record as a whole supports the ALJ's finding that
plaintiff is not disabled. Therefore, plaintiff's motion for
summary judgment will be denied and the decision of the
Commissioner will be affirmed.

## I.    BACKGROUND

On June 27, 2001, plaintiff applied for disability benefits
alleging that he had been disabled since March 30, 2001.
Plaintiff alleges that his disability stems from a heart
condition, diabetes, vision difficulties, scarring of the liver,
high blood pressure, dizzy spells, and swelling and poor

circulation in his legs. Plaintiff's application was denied on January 18, 2002. On November 1, 2002, a hearing was held before Administrative Law Judge Craig Ellis. On April 9, 2003, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On May 30, 2003, the Appeals Council denied plaintiff's request for review. On April 6, 2004, I entered an order granting defendant's motion to remand for further proceedings. The Commissioner was directed to:

> provide further evaluation of plaintiff's functional limitations on a function-by-function basis, evaluate plaintiff's treating physician's statement that plaintiff is unable to work, request from the treating physician an assessment of plaintiff's ability to work, properly evaluate plaintiff's subjective complaints, obtain medical expert evidence, and update the record.

A supplemental hearing was held on March 16, 2005, before Administrative Law Judge Brad Griffith. On November 18, 2005, the ALJ again found plaintiff not disabled. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II. *STANDARD FOR JUDICIAL REVIEW*

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales,

2

402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

Case 2:07-cv-04085-REL   Document 13   Filed 06/13/08   Page 3 of 66

### III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1. Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

4

2.   Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

        No = not disabled.
        Yes = go to next step.

3.   Does the impairment meet or equal a listed impairment in Appendix 1?

        Yes = disabled.
        No = go to next step.

4.   Does the impairment prevent the claimant from doing past relevant work?

        No = not disabled.
        Yes =  go to next step where burden shifts to Commissioner.

5.   Does the impairment prevent the claimant from doing any other work?

        Yes = disabled.
        No = not disabled.

## IV.  THE RECORD

The record consists of the testimony of plaintiff, completed interrogatories by medical expert Morris Alex, M.D., and vocational expert Michael Brethauer, and documentary evidence admitted at the hearings.

## A.  EARNINGS RECORD

The record establishes that plaintiff earned the following income from 1964 through 2002:

Case 2:07-cv-04085-REL   Document 13   Filed 06/13/08   Page 5 of 66

| Year | Income | Year | Income |
|------|--------|------|--------|
| 1964 | $      38.60 | 1984 | $20.986.01 |
| 1965 | 42.90 | 1985 | 18,836.60 |
| 1966 | 501.44 | 1986 | 19,810.95 |
| 1967 | 1,431.08 | 1987 | 19,902.30 |
| 1968 | 2,136.92 | 1988 | 4,447.07 |
| 1969 | 3,701.30 | 1989 | 11,590.41 |
| 1970 | 6,161.05 | 1990 | 23,474.31 |
| 1971 | 7,853.93 | 1991 | 23,529.31 |
| 1972 | 7,840.80 | 1992 | 27,529.91 |
| 1973 | 9,800.14 | 1993 | 30,312.00 |
| 1974 | 12,090.79 | 1994 | 24,329.34 |
| 1975 | 10,915.63 | 1995 | 29,538.56 |
| 1976 | 10,375.20 | 1996 | 10,381.04 |
| 1977 | 12,865.39 | 1997 | 0.00 |
| 1978 | 16,031.81 | 1998 | 0.00 |
| 1979 | 22,900.00 | 1999 | 6,604.23 |
| 1980 | 25,900.00 | 2000 | 18,586.48 |
| 1981 | 29,695.66 | 2001 | 5,215.00 |
| 1982 | 19,233.92 | 2002 | 0.00 |
| 1983 | 18,024.84 | | |

(Tr. at 52, 327).

**B.   SUMMARY OF TESTIMONY**

Plaintiff testified during the November 1, 2002, hearing, and the March 16, 2005, hearing.  Morris Alex, M.D., medical

6

expert, completed interrogatories; and Michael Brethauer, vocational expert, also completed interrogatories.

## 1. Plaintiff's testimony.

During the November 1, 2002, hearing, plaintiff testified that he was 53 years of age (Tr. at 21). His wife of six years passed away from breast cancer in 1998 (Tr. at 21, 28). Plaintiff was married for 18 years before that, but his first wife decided she did not want to be married anymore (Tr. at 29). He kept the children, who were 12 and 15 at the time (Tr. at 29). Plaintiff had completed high school and three years of college (Tr. at 21). He was 6'1" tall and weighed 200 pounds (Tr. at 21). He was in the Navy from 1967 to 1968 and is eligible for medical care through the VA (Tr. at 21-22). Plaintiff's monthly income consisted of $796 for a non-service disability with the VA (Tr. at 22).

Plaintiff last worked in March 2001 as a sales person at a Chevrolet dealer (Tr. at 23). He left that job by mutual agreement because he could not perform the job and his employer did not believe he could perform the job (Tr. at 23). He cannot stand very long, he cannot walk at a brisk pace, he cannot sit very long (Tr. at 24). He had to have veins removed from his legs for his open-heart surgery, so now he has poor circulation in his legs and they stay swollen (Tr. at 24).

7

Plaintiff had a heart attack in July 1994 after which he underwent open-heart surgery (Tr. at 25). He had a second heart attack in August 2001 (Tr. at 24). They decided not to do an angiogram because there was not enough blockage at the time (Tr. at 25). They put him on about ten medications (Tr. at 25). Plaintiff experiences some nausea, some lightheadedness due to his medication (Tr. at 31).

At the time of the hearing, he was having chest pain several times per month (Tr. at 29-30). He takes nitroglycerin and lies down for a couple of hours (Tr. at 30). He becomes extremely tired and his legs swell up, so he lies down or props his legs up every few hours during the day for an hour or two (Tr. at 30). Plaintiff is able to stand for about 20 minutes at a time (Tr. at 30). He can sit with both feet on the floor for 45 minutes to an hour (Tr. at 30). Plaintiff does not have any problems with his feet (Tr. at 32).

Plaintiff was living in a not-for-profit place that houses veterans who have been in the VA hospital (Tr. at 26). He has a room that is free for as long as he wants (Tr. at 26). He does his own laundry which is on the same level as his room (Tr. at 27). Plaintiff was able to drive and drove to the hearing (Tr. at 27).

8

A little over a year before the hearing, plaintiff traveled to Kansas City from Columbia to visit a friend (Tr. at 26). He came back the next day (Tr. at 26-27).

Plaintiff testified that he used to smoke but at the time of the hearing was smoking one cigarette every couple of days (Tr. at 28). He was treated in 1998 for alcohol abuse (Tr. at 28). At the time of the hearing, he had been sober for five years (Tr. at 28).

During the March 16, 2005, hearing, plaintiff testified that he was 55 years of age (Tr. at 275). Plaintiff was attending Columbia College two hours at a time each evening (Tr. at 275). The alternative was to go four hours per night twice a week, but he does not think he could sit for four hours (Tr. at 275). When he gets home from college he lies down and props up his leg because it is normally swollen (Tr. at 276).

Plaintiff's last job was as a car salesman (Tr. at 276). He performed that job for five months and was fired because he could not perform the duties (Tr. at 276-277). Before that he worked for a collection agency for a year (tr. at 277). He sat at a desk all day (Tr. at 277). He cannot do that job now because he can only sit for 45 minutes to an hour and the job was like an "assembly line" and did not permit him to get up (Tr. at 277). Plaintiff worked in the Chaplin service at the VA Hospital in a

9

program called comprehensive work therapy (Tr. at 277). He was hospitalized at that time for alcoholism and worked different jobs in the hospital as part of his therapy (Tr. at 277).

Plaintiff worked construction for part of 1996 and 1997[1] (Tr. at 278). Prior to that plaintiff worked in the plumbing wholesale business, traveling around the city calling on plumbers and mechanical contractors in a sales capacity (Tr. at 278). Before that, he worked at Sears in sales management (Tr. at 278-279).

Plaintiff testified that he cannot walk very far because his legs swell, the left one more than the right (Tr. at 280). This was his problem in March 2001 when he stopped working (Tr. at 280). His leg and foot swell up so bad that he has had to buy bigger shoes (Tr. at 281). The pain and swelling go up to his hip and his back (Tr. at 281). For relief, he lies down and elevates his foot for about two hours at a time several times per day (Tr. at 281). Plaintiff cannot sit in the car for very long before he begins to suffer from pain and swelling in his legs (Tr. at 282). He cannot stand for more than ten to 15 minutes at a time (Tr. at 282).

Plaintiff's legs hurt and swell because he had veins removed for his heart surgery, and because he has diabetes (Tr. at 282).

---

[1]Plaintiff's earnings record shows $0.00 in earned income for 1997.

10

Plaintiff has constant pain, but it is not as bad if he lies down (Tr. at 283). He takes ibuprofen for pain (Tr. at 283). At the time of the hearing, he was also taking medicine for diabetes and high blood pressure (Tr. at 283). He takes nitroglycerin three to four times a month for chest pain (Tr. at 283). The pain gets better within a few minutes (Tr. at 284).

Plaintiff tried to change his diet and tried to exercise more, but his blood sugar was still high with oral medication, so shortly before the hearing his doctor put him on insulin shots (Tr. at 285). Plaintiff has to go to the bathroom about every 30 to 45 minutes because he drinks a lot due to his diabetes (Tr. at 285). The ALJ asked him how many times he had used the bathroom since arriving for the hearing, and plaintiff testified three or four (Tr. at 285-286). This was over a period of about one hour and 45 minutes (Tr. at 286).

Plaintiff testified that he was involved in an automobile accident in February 2002 (Tr. at 286, 287). He has back pain from that (Tr. at 287). He takes ibuprofen and lies down to relieve his back pain (Tr. at 287).

Plaintiff believes he can lift a gallon of milk or a gallon of orange juice (Tr. at 287). A few times he has accidentally lifted something heavier, and that resulted in pain in his lower

11

left back (Tr. at 288). Plaintiff does not bend because of pain in his back and left leg (Tr. at 288).

The ALJ asked plaintiff if he was still smoking, and he said he was smoking about one cigarette per day (Tr. at 288). When the ALJ confronted plaintiff with the inconsistency between that statement and the medical records, he said:

> Well, no . . . six months ago, something like that. Right after my last doctor visit. Maybe they -- maybe more than that. But not too much more. It's I smoke maybe, maybe two cigarettes a day now.

(Tr. at 288-289). When plaintiff's attorney asked him about his struggles with quitting smoking, plaintiff said:

> A.   Oh, I've, I've -- I mean I've messed with it for several years now. I mean, you know, trying to quit and trying -- you know. And of course I, I don't know that I'd contribute it to can't quit. It's won't quit. I mean, you know. But I mean, I realize the need to do it. As my health, heath worsens, I mean, it just creates more problems and more problems. It'll create more circulatory problems. So I've just tried to cut it down. I, I mean, I went through the smoking cessation program.
>
> Q.   What causes you to smoke, I mean, in your opinion?
>
> A.   Habit. Just a -- it's just a habit.

(Tr. at 290A).

Plaintiff's last alcoholic drink was February 26, 1998 (Tr. at 289). After he was fired in March 2001, plaintiff applied for unemployment benefits and received those until September 2001 (Tr. at 290). He was looking for work during that time (Tr. at

12

290). After his unemployment benefits stopped, he stopped looking for work (Tr. at 290).

Plaintiff was diagnosed with depression six months to a year before the hearing (Tr. at 290B). He believes his depression interferes with his ability to work (Tr. at 290B).

## 2. Medical expert testimony.

Medical expert Morris Alex, M.D., submitted answers to interrogatories at the request of the Administrative Law Judge (Tr. at 441-445). He stated that based upon his review of the medical evidence, plaintiff suffers from the following impairments: hypertension, diabetes, atherosclerotic coronary artery disease, lumbar radiculopathy, peripheral vascular disease, and depression (Tr. at 441). These impairments do not meet or equal a listed impairment (Tr. at 441). He stated that the medical records do not support a finding that plaintiff suffers from dizzy spells, liver scarring, or poor eyesight (Tr. at 443). When asked to complete a Physical Capacities Assessment of Ability to do Work Related Activities, Dr. Alex declined "in fairness to claimant" (Tr. at 444). When asked if there was evidence of lower extremity edema and if so the cause, Dr. Alex wrote, "It is common to have edema in a leg where a vein graft for CABG[2] has been converted. When this is not resolved with

---

[2]Coronary artery bypass graft surgery.

Case 2:07-cv-04085-REL   Document 13   Filed 06/13/08   Page 13 of 66

passage of time, then the use of a compression hose is usually used." (Tr. at 445).

## 3. **Vocational expert testimony.**

Vocational expert Michael Brethauer submitted answers to interrogatories at the request of the Administrative Law Judge (Tr. at 329-332). The interrogatories included the following hypothetical:

> Assume a hypothetical worker able to lift and carry ten pounds occasionally; stand and/or walk for a total of up to two hours in an eight-hour workday, with normally-allowed breaks; sit for up to six hours in an eight-hour workday with normally-allowed breaks; who should not climb items such as ladders or scaffolds or crawl; who should avoid even moderate exposure to hazards such as fumes, dust, gases and smoke; and who should only on a less-than-occasional basis use ramps or stairs, stoop, crouch, or kneel.

(Tr. at 331). The vocational expert responded that such a person would not be able to perform any of plaintiff's past relevant work (Tr. at 331). However, the person could work as a skip tracer, with 500 position in the local economy and 20,000 in the nation; a civil service clerk, with 1,000 in the local economy and 110,000 in the nation; or a throw-out clerk, with 500 in the local economy and 20,000 in the nation (Tr. at 131).

The vocational expert was asked whether the requirement that the person stand and stretch for less than five minutes at the work station once per hour or less frequently would affect his answer to the previous question (Tr. at 331). The vocational

14

expert responded that this additional requirement would not prevent the person from performing those three jobs (Tr. at 331).

The vocational expert was asked whether the person would still be able to perform those jobs if he needed to elevate his feet (but not above waist level) at the work station as needed (Tr. at 331). The vocational expert responded that this additional requirement would preclude the performance of those jobs (Tr. at 331).

## C. SUMMARY OF MEDICAL RECORDS

On February 26, 2001, plaintiff saw Pamela Downing, M.D., for a routine follow up (Tr. at 181-182). "He states he has no new problems or concerns, but states he had been out of his medications. He does suffer from diabetes, and states his blood sugars when he is taking his medications run around 120[3]. . . . He does have edema of his left leg that has been present since his bypass. He states he has been compliant with his diet of low salt, low cholesterol, and no concentrated sweets. . . . Patient smokes two packs of cigarettes per day."

Plaintiff reported being employed in the sales industry and also running a non-profit corporation. On exam, Dr. Downing observed 2+ pitting edema of the left leg, none on the right.

---

[3]Normal is 72-116.

Case 2:07-cv-04085-REL   Document 13   Filed 06/13/08   Page 15 of 66

His blood sugar was 412 (normal is 72-116).  Dr. Downing made the following assessments:

> Diabetes mellitus type 2 with probable diabetic nephropathy [disease of the kidney].  Patient was encouraged to be compliant with his diet and medications.
>
> Hemoglobin A1c[4] is pending. . . .
>
> Hypertension, poor control at this time.  Again, patient has not been taking his medications. . . .
>
> Athersclerotic coronary artery disease:  Stable; however, patient did report some mild claudication-like symptoms with walking.  He does continue to smoke two packs of cigarettes a day.  He was encouraged to stop smoking, and was given a prescription for Wellbutrin-SR[5]. . . ."

March 30, 2001, is plaintiff's alleged onset of disability. He filed his application for benefits on June 27, 2001.

On July 20, 2001, plaintiff saw Dr. Downing for a routine follow up of diabetes and hypertension (Tr. at 175-176).  "He reports today that he has been out of his medications for the past one month.  He has numerous complaints and concerns.  He is having vertigo[6] episodes, but no tinnitus [ringing in the ears].

---

[4]Hemoglobin A1c is a test that measures the amount of glycosylated hemoglobin in the blood. Glycosylated hemoglobin is a molecule in red blood cells that attaches to glucose (blood sugar). There will be more glycosylated hemoglobin if there is more glucose in the blood.  The test gives a good estimate of how well diabetes is being managed over the last two or three months. For a health adult, normal is 4.8% to 5.9%.  For a diabetic adult, normal is less than 7.0%.

[5]An antidepressant used to help people stop smoking by reducing cravings and other withdrawal effects.

[6]A sensation of spinning or whirling motion.

16

He has no nausea and vomiting associated. He is also having left-sided chest pain, as well as edema. He has decreased sensation in his feet and pain with walking. He denies palpitations[7], orthopnea[8], or paroxysmal nocturnal dyspnea[9]. He does not know what his blood sugar has been running, as he has not been checking it." Plaintiff was still smoking two packs of cigarettes per day. "Extremities were remarkable for 2+ edema of the left leg and none on the right." Plaintiff's blood sugar was 393. "Last hemoglobin A1c [see footnote four, normal for a diabetic adult is 7.0%] was February 26, 2002 was 12.2."

Dr. Downing ordered another HGB A1c test which was 10.4% (Tr. at 134). She assessed diabetes mellitus type 2 with poor control. "He was instructed on the importance of medical compliance. He will be rescheduled for an eye examination. He did not keep his prior scheduled appointment." She also assessed hypertension "again with poor control secondary to medical noncompliance. He was instructed of the risks of uncontrolled hypertension. The patient was instructed to take his medications as prescribed so that we might be able to accurately monitor his

---

[7]Irregular pulsation of the heart perceptible to the patient.

[8]Difficulty breathing while lying down.

[9]Sudden, severe shortness of breath at night that awakens a person from sleep, often with coughing and wheezing.

17

response to therapy." Dr. Downing assessed history of coronary artery disease, status post bypass, now with left-sided chest pain. "Will schedule a Persantine Sestamibi[10]." Dr. Downing assessed complaints of leg pain consistent with claudication. "The patient has diminished pedal pulses, and his feet were cool to touch. "Will schedule ankle-arm indices[11] to further evaluate." Plaintiff was also assessed with complaints of vertigo, and Dr. Downing recommended an evaluation by an Ear, Nose & Throat specialist. "Pt also strongly encouraged to stop smoking given his numerous risk factors for stroke and recurrent mi [myocardial infarction, or heart attack]."

On July 31, 2001, plaintiff saw Dr. Himanshu Shukla in the emergency room due to chest pain that had begun four days earlier (Tr. at 162-172). His blood sugar was 334 [normal is 72-116];

---

[10]This is a two-day test. One day one, electrode patches are placed on the chest to record heartbeats. An intravenous line is used to administer the Nuclear Medicine and Persantine. An Electrocardiogram (EKG) is taken while at rest. Blood pressure and pulse are monitored before, during, and following the test. A small amount of Technetium-99m (Sestamibi) is injected during the test. Sestamibi enables a specialized camera to view how well the blood is getting to the heart muscle. On the second day, the patient is injected with Sestamibi followed by a one-hour wait during which the patient eats a light, fatty meal. The blood flow to the heart is then viewed and recorded.

[11]Screening assessment of arterial circulation in the legs and feet.

18

his triglycerides[12] were 397. He reported smoking one pack of cigarettes per day.  Plaintiff had full pain-free range of motion in his extremities, "some tenderness to palpation in the calves, which is not new and he attributes to his claudication[13]."  He was assessed with non q wave myocardial infarction [heart attack].  He was admitted to the intensive care unit, given IV heparin[14], and scheduled for an ECG[15] the next morning.

On August 3, 2001, plaintiff saw Thomas Dresser, M.D. (Tr. at 122, 124, 148).  Plaintiff exercised on the treadmill for eight minutes, achieving a peak heart rate of 113.  Images of the

---

[12]Triglycerides are the chemical form in which most fat exists in food as well as in the body. They are also present in blood plasma and, in association with cholesterol, form the plasma lipids.  Triglycerides in plasma are derived from fats eaten in foods or made in the body from other energy sources like carbohydrates. Calories ingested in a meal and not used immediately by tissues are converted to triglycerides and transported to fat cells to be stored.  Hormones regulate the release of triglycerides from fat tissue so they meet the body's needs for energy between meals.  Excess triglycerides in plasma is called hypertriglyceridemia. It's linked to the occurrence of coronary artery disease in some people. Elevated triglycerides may be a consequence of other disease, such as untreated diabetes mellitus.  Normal is less than 150.

[13]Limping. Intermittent claudication is an aching, crampy, tired, and sometimes burning pain in the legs that comes and goes.  It typically occurs with walking and goes away with rest and is due to poor circulation of blood in the arteries of the legs.

[14]A blood thinner that prevents the formation of blood clots.

[15]Also known as an EKG; records the electrical activity of the heart.

Case 2:07-cv-04085-REL   Document 13   Filed 06/13/08   Page 19 of 66

heart were obtained and his ejection fraction[16] was 39% (normal is greater than 45%).

That same day plaintiff also saw Robin Trotman, D.O. (Tr. at 146-147). During a physical exam, Dr. Trotman observed no swelling in plaintiff's extremities. His lab work showed his blood glucose at 218 (normal is 72 to 116). Plaintiff's chronic obstructive pulmonary disease was listed as stable. "I spoke with Mr. Sims at length about the risks associated with continued smoking. I also told him that extended exertion could be dangerous and he should consult his PCP [primary care physician] and until then not over-exert."

On August 15, 2001, plaintiff saw Dr. Downing for a routine follow up (Tr. at 159-160). "He is doing well, and he has had no further episodes of chest pain. Patient is working hard on being compliant with diet and exercise. . . . This morning, his blood sugar was 251. . . . Patient does continue to smoke cigarettes." Dr. Downing performed a physical exam. Plaintiff's blood pressure was 155/77, he had no swelling in his extremities. Dr.

---

[16]During each heartbeat cycle, the heart contracts and relaxes. When the heart contracts (systole), it ejects blood from the two pumping chambers (ventricles). When the heart relaxes (diastole), the ventricles refill with blood. No matter how forceful the contraction, it does not empty all of the blood out of a ventricle. The term "ejection fraction" refers to the percentage of blood that is pumped out of a filled ventricle with each heartbeat. This measures the capacity at which the heart is pumping.

Case 2:07-cv-04085-REL   Document 13   Filed 06/13/08   Page 20 of 66

Downing assessed atherosclerotic coronary artery disease, status post recent myocardial infarction. "Will start supervised exercise program for cardiac concerns. This will help control his blood pressure and improve his blood sugars." She also assessed hypertension, still not optimal but improved; and diabetes, "again still not optimal but improved. Will make no adjustments in his medication at this time." She assessed tobacco use. "Patient will be restarted on Wellbutrin. He is not interested in using NicoDerm patches at this time. He has started participating in a smoking cessation support group."

On August 20, 2001, plaintiff had his eyes examined (Tr. at 143-144). Plaintiff's visual acuity was 20/20 in both eyes, with or without glasses.

On September 18, 2001, plaintiff saw Carrie Pie, R.N. (Tr. at 134-137). "First visit to this clinic in a long while. Was originally seen 11/5/98. . . . Reports BGs [blood glucose, or sugar] are running in the 200s before meals. BG today is 180 fasting. . . . Diet: Cooks for self - eats out occasionally, eating too much starch from his description. Usually skips breakfast. Light lunch and supper 'pig out'. . . . Activity: not very active - relates to poor leg circulation - plans to start in cardiac rehab program here. Does not walk or have other regular activity now." Ms. Pie recommended that plaintiff

21

exercise for 30 minutes every day.

On November 8, 2001, plaintiff saw Dr. Downing for a follow up (Tr. at 128-131, 366). "He feels that he is doing quite well. . . . He has no chest pain, shortness of breath, orthopnea, or pedal edema [swelling of the ankles and feet]. . . . Patient has a long history of alcohol abuse, but has been sober for greater than three years. He continues to smoke two packs of cigarettes per day. He does report that he is going to support group for smoking cessation."

Dr. Downing examined plaintiff and observed no swelling in his extremities. She assessed atherosclerotic coronary artery disease[17], status post myocardial infarction [heart attack]. "Patient continues to be chest pain-free, and is doing well on his cardiac medications." She also diagnosed diabetes mellitus type 2. "Blood sugars are improved, but not yet optimal. Patient verbalized that he needs to continue working hard on diet changes. He has increased his exercise, and will continue to work in that direction." A1c was 10.4% (see footnote four, normal for a diabetic adult is 7.0% or less). Her diagnoses also included:

3. Chronic obstructive pulmonary disease, stable on no medications.

_____

[17]Thickening or hardening of the coronary arteries.

22

4.    Peripheral vascular disease[18].  Patient is on aspirin therapy.  Explained to patient he needs to continue exercising as he has been in order to improve his circulation to his lower extremities.

5.    Hypertension, excellent control on current medications.  Will make no changes.

6.    Tobacco use:  Patient is not taking Wellbutrin at this time.  He is, however, working with the smoking cessation support group and is willing to make changes to decrease his tobacco use.  However, he is not ready for resumption of Wellbutrin or NicoDerm patches at this time.

7.    History of alcoholism.  Continues to be abstinent.  He continues to be very active in Alcoholic Anonymous.

On November 16, 2001, plaintiff saw Mark Nunn, cardiology nurse (Tr. at 119).  Plaintiff said he felt good, "States he had been walking on the Katy Trail at home."  Plaintiff walked six laps on the track, 15 minutes on the treadmill at 2.0 mph increasing to 2.5 mph.  At 14 minutes, he said he felt good and increased his pace to 3.3 mph for the last minute.  He tolerated the activity well with no cardiac symptoms.

---

[18]This refers to diseases of blood vessels outside the heart and brain. It is often a narrowing of vessels that carry blood to the legs, arms, stomach or kidneys.

On November 19, 2001, plaintiff saw Mark Nunn, cardiology nurse (Tr. at 118).  Plaintiff walked on the treadmill for two minutes at 1.5 mph, three minutes at 2.0 mph, 15 minutes at 2.8 mph, and walked five laps on the track.  Plaintiff tolerated the activity well, had no cardiac symptoms or ECG changes.  He had some lower leg pain and right hip pain but that did not interfere with exercising and resolved within ten minutes after exercising.

On November 21, 2001, plaintiff saw Mark Nunn, cardiology nurse (Tr. at 117).  Plaintiff walked on the treadmill for two minutes at 1.5 mph, three minutes at 2.0 mph, ten minutes at 2.8 mph, and walked five laps on the track.  He tolerated the activity well with no cardiac symptoms or ECG changes.  He developed some lower leg pain and right hip pain, so he stopped five minutes early.  His pain resolved within ten minutes after he completed his exercising.

On November 23, 2001, Pamela Downing, M.D., wrote a letter to whom it may concern (Tr. at 109, 326).  The letter reads as follows:  "Mr. Warren Sims has been seen in primary care clinic at Harry S. Truman V.A. Hospital for several years.  Mr. Sims suffers from several chronic diseases.  He has atherosclerotic coronary heart disease that makes it impossible to work.  Mr. Sims should be considered 100% disabled and unable to gain

suitable employment. Further information and specific details can be obtained from the medical record."

On November 28, 2001, plaintiff saw Mark Nunn, cardiology nurse (Tr. at 116). He exercised for 20 minutes on the treadmill at 2.0 mph and ten minutes on the Airdyne bike at 35-40 rpm. He had mild leg pain but no cardiac symptoms.

On November 30, 2001, plaintiff saw Mark Nunn, cardiology nurse (Tr. at 115). Plaintiff exercised for 20 minutes on the treadmill at 2.0 mph, 10 minutes on the NuStep, and walked five laps on the track. He was tolerating exercise activity well with no ECG changes or cardiac symptoms.

On December 3, 2001, plaintiff saw Mark Nunn, cardiology nurse (Tr. at 114). He exercised for 20 minutes on the treadmill at 2.0 miles per hour, ten minutes on the Airdyne bike at 35-40 rpm, ad walked five laps on the track for cool down. He was tolerating exercise activity well with no ECG changes or cardiac symptoms.

On December 15, 2001, plaintiff failed to show for an appointment with John Higdon, PhD, a staff psychologist plaintiff had been seeing for help in quitting smoking (Tr. at 231).

On December 17, 2001, plaintiff saw Mark Nunn, cardiology nurse (Tr. at 230). Plaintiff's blood pressure was 177/100 at

rest. "This exercise session will be cancelled due to increased risks associated with elevated resting BP."

On December 28, 2001, plaintiff saw Mark Nunn, cardiology nurse, for cardiac rehab (Tr. at 224). He walked on the treadmill for 25 minutes (15 at 2.5 mph), used the exercise bike for ten minutes, and walked three laps on the track. "Patient able to resume exercise at previously established level after being away for 2 weeks. Tolerated exercises well without any cardiac symptoms."

On January 4, 2002, plaintiff saw Mark Nunn, cardiology nurse, for cardiac rehab (Tr. at 223). Plaintiff walked on the treadmill for 25 minutes (15 at 2.5 mph), used the exercise bike for ten minutes, and walked three laps on the track. "Tolerating exercises well without any cardiac symptoms. Continues to have bilateral leg discomfort while exercising."

On January 8, 2002, plaintiff failed to show for an appointment with John Higdon, PhD, a staff psychologist plaintiff had been seeing for help in quitting smoking (Tr. at 222).

On January 11, 2002, plaintiff saw Mark Nunn, cardiology nurse, for cardiac rehab (Tr. at 221). He walked on the treadmill for 25 minutes (15 at 2.5 mph), used the exercise bike for ten minutes, and walked three laps on the track. "Tolerating exercise well at this time. Progress has been diminished due to

26

missed sessions.  Has been unable to attend several sessions recently due to holidays and personal conflicts with scheduling."

On January 14, 2002, plaintiff saw Mark Nunn, cardiology nurse, for cardiac rehab (Tr. at 220).  He walked on the treadmill for 25 minutes (15 at 2.5 mph), used the exercise bike for 11 minutes, and walked three laps on the track.  "Tolerating exercise well at this time."

On January 16, 2002, plaintiff saw Mark Nunn, cardiology nurse, for cardiac rehab (Tr. at 219).  Plaintiff walked 25 minutes on the treadmill (15 at 2.5 mph), rode the exercise bike for ten minutes, and walked three laps on the track for cool down.  "Continues to tolerate exercise well.  No cardiac symptoms noted during session.  Continue exercise program as established."

On January 17, 2002, plaintiff saw John Higdon, PhD, a staff psychologist (Tr. at 218).  "Mr. Sims was seen for smoking cessation, and he has not yet been successful, although he has switched to a very low tar and nicotine brand and smokes only a couple packs, down from before.  He said he was going to Florida in a couple months with a woman friend of his and we discussed how he might quit then, and she does not smoke or drink, and they will be quite busy."

On January 18, 2002, plaintiff saw Mark Nunn, cardiology nurse, for cardiac rehab (Tr. at 217).  Plaintiff walked 25

27

minutes on the treadmill ( at 2.5 mph), used the exercise bike for ten minutes, and walked three laps on the track. "Tolerated exercise well today. . . . Continue as scheduled. Will begin increasing exercise duration next week."

On January 23, 2002, plaintiff saw Mark Nunn, cardiology nurse, for cardiac rehab (Tr. at 216). Plaintiff walked 30 minutes on the treadmill (20 at 2.5 mph), used the exercise bike for ten minutes, and walked three laps on the track. "Increased duration of TM exercise from 15 min at exercise pace to 20 min without difficulty. Patient is doing well on the program with gradual advancement. No cardiac symptoms are noted during the sessions. Patient will be out of town Friday."

On January 30, 2002, plaintiff saw Mark Nunn, cardiology nurse, for cardiac rehab (Tr. at 215). Plaintiff walked 30 minutes on the treadmill (20 at 2.5 mph), used the exercise bike for ten minutes, and walked three laps on the track. "Continues to tolerate exercise sessions well. . . . Primary complaint is bilateral leg pain. . . . Continue program as established."

On February 1, 2002, plaintiff saw Mark Nunn, cardiology nurse, for cardiac rehab (Tr. at 214). Plaintiff walked a total of 30 minutes on the treadmill (20 at 2.5 mph), used the exercise bike for 10 minutes, and walked three laps on the track.

28

"Continues to tolerate exercise well. . . . Primary complaint is bilateral leg pain. . . . Continue program as established."

On February 6, 2002, plaintiff saw Mark Nunn, cardiology nurse, for cardiac rehab (Tr. at 213). Plaintiff walked on the treadmill for five minutes at 1.8 mph, 20 minutes at 2.5 mph, and five minutes at 1.8 mph. He used the Airdyne bike for 10 minutes at 35-40 rpm and walked three laps on the track for cool down. Plaintiff continued to tolerate exercise sessions well. "Primary complaint is bilateral leg pain." Plaintiff was to continue the current exercise program.

On February 7, 2002, plaintiff saw Dr. Ashwani Bedi (Tr. at 211-212). "He has been doing well in rehab program and walks 30 minutes on treadmill without any significant discomfort. . . . Extremities without cyanosis, clubbing, or edema." Dr. Bedi assessed coronary artery disease, status post CABG and non Q wave MI [heart attack], presently stable. "Encouraged regular exercise, weight loss, and smoking cessation."

On February 22, 2002, plaintiff saw Mark Nunn, cardiology nurse, for cardiac rehab (Tr. at 206). Plaintiff exercised at current level without difficulty or cardiac symptoms. His primary complaint was bilateral leg pain. "Patient encouraged to try taking ibuprofen prior to exercises to see if that helps reduce his leg pain."

29

On May 15, 2002, plaintiff saw Dr. Downing for a routine follow up (Tr. at 202-203, 366). "Still has leg pain with ambulation and has not noticed improvement with exercise, has been going to cardiac rehab faithfully. . . . Patient notes that blood sugars are consistently > 200 w/o hypoglycemia. . . . chronic edema of 1 leg since cabg." His blood sugar was 288. A1c was 10.0% (see footnote four, normal for a diabetic adult is 7.0% or less). Dr. Downing assessed diabetes with poor control, atherosclerotic coronary artery disease, stable on current medications. Plaintiff was "encouraged to continue exercise program." Plaintiff also complained of continued claudication. "Patient understands that tobacco use continues to contribute to this problem." Plaintiff had decreased his smoking from two packs per day to 1/2 pack per day. Dr. Downing told him to continue exercising and encouraged him to quit smoking. Plaintiff was not interested in medications or patches to assist in quitting.

On June 3, 2002, plaintiff left a message at Dr. Downing's office and eventually talked to Betty Walk, RN (Tr. at 200). "Mr. Sims states that he did not say anything about the pain to Dr. Downing as he thought that it would get better. Was in a MVA [motor vehicle accident] in Feb. Has neck pain that radiates down the left leg. Has not fallen. . . . X-rays at Boone were

Case 2:07-cv-04085-REL   Document 13   Filed 06/13/08   Page 30 of 66

negative after the accident. . . .  Had PT [physical therapy]
which seemed to make the pain worse. . . .  Instructed Mr. Sims
to increase the Gabapentin [treats seizures] to BID [twice a
day].  Discussed with Dr. Downing.  Mr. Sims does not want
narcotics.  She will electronically enter a script for parafon
forte for Mr. Sims to try for the pain.  Also to get MRI of the
c-spine and l-spine.  Have scheduled the MRI's for 26 June.
Called and left the above message for Mr. Sims."

On June 13, 2002, plaintiff saw George Carr, M.D., at the
request of plaintiff's disability lawyer (Tr. at 233-236).  The
letter to plaintiff's attorney reads in part as follows:

> In accordance with your request, Warren R. Sims was examined
> by me in this office for Social Security Disability
> Determinations.
>
> HISTORY OF PRESENT ILLNESS:
> Mr. Simms reports that he stopped work in March of 2001 due
> to increasing problems with activity.  He has a history of
> coronary artery bypass in 1994.  He also complains of pain
> in his legs with activity typical of claudication.  He also
> reports that he has persistent episodes of chest pain that
> he takes Nitroglycerin for sublingually. . . .  He
> additionally has joint pain in his knees and in his fingers
> which has been diagnosed as arthritis.  He has been
> diagnosed with COPD.
>
> * * * * *
>
> MEDICATIONS:  The patient takes Nitroglycerin sublingual
> p.r.n. [as needed], Lisinopril [for hypertension],
> Chlorzoxazone [muscle relaxer], Zocor [lowers cholesterol],
> Neurontin, Metropolol [for hypertension], aspirin, Avandia
> [for diabetes], Glyburide [for diabetes]. . . .

31

SOCIAL HABITS:  Mr. Sims reports that he smokes one-half to
one pack of cigarettes per day.  He reports that he stopped
drinking approximately two years ago [i.e., June 2000].

OCCUPATIONAL HISTORY:  The patient stopped working in 03/01,
after working as a car salesman for approximately one year.
He worked as a collection agency representative for a year
before that, and prior to that worked for Sears as a
salesman for most of his career. . . .

HEART AND LUNGS:  Examination is within normal limits. . . .
GAIT:  Gait is somewhat stiff and deliberate.

MUSCULOSKELETAL EXAM:
SPINE:  Cervical, thoracic, and lumbar spine range of motion
and palpation are normal.
EXTREMITY AND JOINT EXAM:  The patient has crepitance [a
grating sensation] in range of motion of his knees as well
as some tenderness to his knees and ankles.  There is some
thickening to both knees and ankles.  There is some
thickening of the joints of the fingers as well.

*All opinions expressed in this section and the remainder of
this report are based on a reasonable degree of medical
certainty, the results of the physical examination and
testing procedures performed during this evaluation, review
of medical records, (x-rays if available), and the history
provided by the examinee.*

DIAGNOSES AND IMPRESSIONS:
1.    Athersclerotic heart disease.
2.    COPD [chronic obstructive pulmonary disease].
3.    Diabetes mellitus.
4.    Hypertension.
5.    Osteoarthritis.
6.    Recurrent angina status post MI [myocardial infarction,
      or heart attack].

SUMMARY AND CONCLUSIONS:
Mr. Simms [sic] has multiple chronic illnesses including
documented heart disease status post MI.  He is a diabetic
and has COPD and peripheral vascular disease as well as
osteoarthritis.  He certainly would be an equate with this
combination.  He also seems to meet the criteria for Social
Security Disability under listing 4.04A5.  He meets under
the situation that he has suffered a myocardial infarction

32

and continues to have angina requiring sublingual
Nitroglycerin several times per month.

MEDICAL RECORD REVIEW:
In addition to interviewing and examining Mr. Simms [sic], I
reviewed the medical records and files submitted by your
office, including the following:
Hospitals/Clinics:  Harry S. Truman VA Hospital, 05/0-5/98
                    to 08/12/01
                    Capital Region Medical Center, 01/07/02

(Tr. at 233-236).

On July 11, 2002, plaintiff saw Suzanne Farrell, a clinical

pharmacist (Tr. at 377).  She noted that plaintiff needs better

glucose control.  His A1c was 8.9% (see footnote four, normal for

a diabetic adult is 7.0% or less) (Tr. at 366).

On September 9, 2002, Dr. George Carr completed a Medical

Source Statement Physical (Tr. at 240-242).  Dr. Carr found that

plaintiff could lift ten pounds (frequently or occasionally),

could stand or walk for 30 minutes at a time and for a total of

four hours per day, and could sit for one hour at a time and for

a total of four hours per day.  He found that plaintiff should

never climb, balance, or stoop, and that he could occasionally

kneel, crouch, or bend.  He found that plaintiff had an unlimited

ability to reach, but that he had a limited ability to handle,

finger, and feel.

There is no explanation in the form as to why plaintiff

would be limited in his ability to handle, finger, and feel.

When asked to describe the principal clinical and laboratory

33

findings and symptoms or allegations (including pain) from which the impairment-related capacities and limitations were concluded, Dr. Carr wrote, "abnormal cardiac, lung and arterial testing as well as elevated glucose levels." The form asks whether the physical ability statement includes consideration of pain, discomfort and/or other subjective complaints, and Dr. Carr checked, "yes". The form asks whether rest would be helpful to plaintiff, and Dr. Carr checked, "yes". The form asks if any of the following would be considered helpful to plaintiff in regard to existing pain or fatigue, and Dr. Carr checked, "yes" to all of the following: Assuming a reclining position for up to 30 minutes, one to three times per day; assuming a supine position for up to 30 minutes, one to three times per day; and propping up legs to a height of two to three feet, one to three times a day while sitting.

On October 26, 2002, plaintiff saw Dr. Ashwani Bedi due to chest congestion and cough (Tr. at 372-375). Dr. Bedi observed no edema. He assessed bronchitis.

On November 5, 2002, plaintiff saw Dr. Randall Smith due to pain in his left hip radiating down the left leg. Dr. Smith performed an electromyography and assessed left S1 radiculopathy(Tr. at 370-372).

34

On November 12, 2002, plaintiff saw Dr. Downing for a follow up (Tr. at 366, 368-370). His A1c was 8.4% (see footnote four, normal for a diabetic adult is 7.0% or less). He was having complaints of left leg pain, "continues to walk, . . . continues to smoke but has decreased tobacco to a few cigarettes a day". Plaintiff had reported radicular pain. He reported that his pain was manageable with his current medications. He had no chest pain with exertion or rest but he complained of chronic edema. On exam, Dr. Downing noted no edema. She assessed diabetes with continued poor control, atherosclerotic coronary artery disease, stable on current medications; hypertension, adequate control on current medications; lumbar disc disease, pain control adequate at this time; and peripheral vascular disease, stable and improved, "encouraged continued tobacco cessation, patient feels that he can quit on his own, and is not interested in tobacco cessation at this time".

On December 16, 2002, plaintiff saw Alexandra Lewis, a physical therapist (Tr. at 367-368). "Veteran is a 53 year old man with LBP [lower back pain] and left radiculopathy to left foot. He is disabled since cardiac bypass. He describes his activity level as sedentary because his LBP makes it too painful for him to walk any distance or participate in any activities."

Case 2:07-cv-04085-REL   Document 13   Filed 06/13/08   Page 35 of 66

Ms. Lewis went over very basic lower abdominal strengthening and gluteal strengthening exercises.

On December 24, 2002, plaintiff saw Alexandra Lewis, a physical therapist (Tr. at 365). He told Ms. Lewis that he had been exercising about every other day. His lower back pain was unchanged. "HEP [home exercise program] was reviewed with him and he was not doing the exercises correctly. . . . EMS/ultrasound to low back. Veteran said he had to leave early so he was not fitted with a lumbosacral corset as planned."

On January 12, 2003, plaintiff saw Dr. Blake Brooks due to a cough (Tr. at 364-365). Dr. Brooks noted that plaintiff was smoking 1 1/2 packs of cigarettes per day. Plaintiff had no edema. Dr. Brooks diagnosed upper respiratory infection and prescribed Robittusin DM and a decongestant.

On March 12, 2003, plaintiff saw Garth Russell, M.D., in connection with an automobile accident that occurred on February 23, 2002 (Tr. at 247-253). On March 24, 2003, Dr. Russell wrote a letter to Thad Mulholland, an attorney. The letter reads in part as follows:

> The following is a narrative report based upon my interview with the patient as well as the physical examination and a review of the records of the Columbia Orthopaedic Group.
> CHIEF COMPLAINT: Pain in his lower back going down the left lower extremity into his foot.
> HISTORY OF PRESENT ILLNESS: The patient states that he was well until February 23, 2002, at about 11:00 a.m. At that time, he was the driver of a car that was involved in a

36

motor vehicle accident in Kansas City, Missouri.  He states
the accident occurred when he struck a vehicle that turned
in front of him. . . .  He was able to return to his home in
Columbia, Missouri.  He states that he then developed
soreness and stiffness in his lower back and neck.  He
thought that the conditions were only temporary, but when he
did not get better, he was seen in the emergency room at
Boone Hospital Center in Columbia, Missouri.  There he was
examined, x-rays were taken, and he was referred to a
specialist.  He was placed on physical therapy, but when the
physical therapy produced an increasing amount of pain in
his back which began to go down his left lower extremity, he
consulted the Harry S. Truman V.A. Hospital in Columbia,
Missouri.  In addition he continued to have pain in his neck
with radiation in his left arm. He was examined at the VA,
and an MRI was performed of his lower back and his neck, as
well as an EMG.  He states that the physical therapy
increased his pain so that he has had to limit his activity.

CURRENT TREATMENT:  The patient states that he takes
approximately four Ibuprofen per day to combat the
persistent pain in his back going down his left lower
extremity to his foot.  The pain is accompanied by some
swelling of the left leg and aggravated by increased
activity.  He noted sitting in a car and riding in a car
bothers him.  He has had to stop playing golf because of the
discomfort.  The pain in his neck has improved but still
bothers him upon occasion and he has mild radiation in his
left upper extremity.  He retired two years ago after a
coronary occlusion.  He had worked for Sears Roebuck Company
for many years.  He notes no numbness, tingling, or
weakness.

PAST MEDICAL HISTORY:  Past history reveals that the
patient had a quadruple bypass 10 years ago.  The veins that
were used in the graft were taken from the left lower
extremity.

The patient also sustained an injury to his back while
employed by Sears and Roebuck in August of 1991.  He was
seen by me upon that occasion and was treated
conservatively.  He did recover from a herniated disc
central at L5-S1.  He had been last seen for this condition
on February 10, 1992, with the last prescription for
medication given on March 12, 1992.

The patient also has diabetes mellitus for which he
takes Glyburide.  He also has hypertension and takes anti-
hypertensive medication.

Case 2:07-cv-04085-REL   Document 13   Filed 06/13/08   Page 37 of 66

PHYSICAL EXAMINATION:  Physical examination reveals a well developed, slightly stocky male in no acute distress. He sits somewhat uncomfortably in the chair moving from side to side.  He gets up from the chair slowly and walks with a normal gait.  He can heel and toe walk without difficulty. He does have swelling in his left lower extremity with it being 1.5 cm larger at its greatest circumference than on the right.  He has incisions over the left lower extremity where the saphenous vein system was removed for his bypass surgery.

Examination of his back reveals moderate muscle spasm present.  He has 50 percent normal forward flexion with no extension.  There is 50 percent of the normal lateral deviation, both to the right and the left. . . .  Straight leg raising is positive at 90 degrees on the left and negative on the right.  There are no reflexes detectable either at the knee or the ankle in either of the extremities. . . .  There is decreased sensation to touch over the S1 nerve root on the left side.

Examination of his neck reveals minimal muscle spasm present.  There is a loss of 20 percent of normal motion. The reflexes are normal in both upper extremities.  There is no evidence of nerve root pressure.

X-RAYS:  X-rays of the lumbar spine showed total collapse of the L5-S1 disc space.  There are moderate degenerative changes in the sacroiliac joints bilaterally. The hip joints appear normal with good maintained space. There are some degenerative reactive changes in the lower lumbar area.

MRI of the lumbar spine taken June 26, 2002, shows a mild disc space narrowing at T12-L1 with a broad posterior disc bulge.  There is some minimal loss of disc height at L1-2.  At L5-S1 there are mild degenerative disc changes with loss of the disc height.  There is a broad posterior bulge, but no focal disc protrusion.  There is mild encroachment on the neural foramina bilaterally secondary to the loss of disc space.

MRI of the cervical spine from June 26, 2002, shows mild central disc bulge, but no focal herniation at C4-5. At C5-6 there is a small central disc protrusion, but no evidence of nerve root pressure.  At C6 and 7 there is a left lateral narrowing of the left neural foramen secondary to joint hypertrophy.

DIAGNOSIS:  (1) Acute and chronic cervical strain superimposed upon pre-existing degenerative disc disease of the neck, healed with mild residual; (2) acute and chronic

38

lumbosacral strain superimposed upon pre-existing degenerative disc disease, healed with moderate residual impairment (3) herniated disc T11-12 secondary to the motor vehicle accident, healed with mild residual.

DISCUSSION:  . . .  It is my opinion, based upon his history, his physical examination and his diagnostic studies, that he will continue to have episodes of stiffness and soreness in his neck which may go out into the left shoulder.  The pain will be aggravated mainly by changes in the weather, extensive physical activity involving his neck, or periods of stress.

. . .  He continues with a moderate amount of swelling in his left lower extremity.  Part of this swelling in my opinion is due to the fact that the venous graft for his bypass surgery of his heart was taken from the left lower extremity.  However, this is aggravated by the fact that pressure on the nerve root on the left side causes some continued tightness in the musculature of the left leg which aggravates the fact that he has venous insufficiency.  This produces a swelling and the discomfort.

In my opinion, based upon his history, the amount of time since the injury, his diagnostic studies, the symptoms are permanent and will continue throughout the remainder of his life.  He takes Ibuprofen (one four times per day for pain) which seems to keep his pain under control. . . .

In summary, it is my medical opinion that the patient's present symptoms and signs, both in his neck and lower back as well as his left lower extremity, are secondary to the motor vehicle accident of February 23, 2002. . . .

(Tr. at 247-253).

On July 11, 2003, plaintiff saw Dr. Angampally Rajeev due to an injury to his ear (Tr. at 360-362).  "[I]njured 2 days ago with BIC pen cap while trying to get wax out of the ear".  He said he had tried Motrin with no relief, requested Vicodin or Perocet, both narcotic analgesics.  He had no chest pain, no leg swelling, no arm or leg weakness.

Case 2:07-cv-04085-REL   Document 13   Filed 06/13/08   Page 39 of 66

On August 19, 2003, plaintiff had an MRI of the lumbar spine (Tr. at 380-381).  "Had MRI last year, neurosurg[ery] is requesting a new one."  Michael Aro, M.D., found:

     1.   Prominent, central, broad based bulge at L5-S1 which narrows the lateral recesses and abuts the traversing S1 nerve roots bilaterally.  Overall appearance is not significantly changed. There is moderate bilateral neuroforaminal narrowing secondary to loss of disc height, ligamentum flavum thickening and the disc bulges.  This is slightly worse on the left.  Clinical correlation is suggested.
     2.   Small right-sided disc protrusion or prominent disc bulge at T12-L1 without change.

On October 31, 2003, plaintiff saw Dr. Downing for a follow up (Tr. at 349-351).  He reported no chest pain.  He did continue to have back pain but said it was manageable as long as he restricted his activity.  He had no myalgias or weakness.  He had not been checking his blood sugar but denied excessive thirst or urination, denied parasthesias.  He continued to smoke 1/2 pack of cigarettes per day.  On exam he had no edema in his extremities.  Assessment:  Diabetes mellitus type 2 with continued poor control.  Dr. Downing told plaintiff that if his blood sugars had not improved within three months, he would most likely require insulin.  She also assessed hypertension, adequate control on current medication; peripheral vascular disease, stable and improved, "encouraged continued tobacco cessation, patient not interested in intervention at this time"; and lumbar disc disease, pain control adequate.

On March 29, 2004, plaintiff saw Gregory Brandenberg, M.D.
(Tr. at 378-379, 413, 416-417).  In a letter to Dr. Downing, Dr.
Brandenberg stated in part as follows:

> He is a very pleasant 54-year-old male who was referred to
> me for evaluation of lumbar discopathy.
>
> Mr. Sims is complaining mostly of low back pain, bilateral
> lumbosacral, which is pretty much constant, as well as left
> leg pain, which radiates down the posterolateral thigh and
> calf to the lateral toes.  This leg pain also is constant.
> He describes the back pain as bothering him more than the
> leg pain.
>
> He states this all began two years ago when he was in a
> motor vehicle accident in which he was a restrained driver
> of a vehicle that was struck by another car that pulled into
> his path.  He denies any problems with back pain prior to
> that accident but has had ongoing problems since.  He states
> that the pain increases with most activities, including
> standing, sitting, and holding static positions, and he will
> get some relief with Ibuprofen. . . . Treatment thus far has
> consisted of Ibuprofen and physical therapy. . . .
>
> PAST MEDICAL HISTORY:  Significant for diabetes, coronary
> artery disease, and hypertension.
>
> * * * * *
>
> SOCIAL HISTORY:  . . .  He smokes one pack of cigarettes per
> day.
>
> REVIEW OF SYMPTOMS:  Negative for ongoing angina [chest
> pain] or dyspnea [shortness of breath] on exertion.
>
> PHYSICAL EXAMINATION: . . .
> GAIT AND STANCE:  His gait is normal.  He arises from a
> chair to a standing position without difficulty.

41

MUSCULOSKELETAL:
    Spine:  There is some diffuse lumbosacral tenderness to palpation. . . .  He has diminished range of motion of the lumbar spine in all planes, and lateral bending does cause discomfort.  Straight leg raising maneuver is positive on the left.
    Extremities:  Strength in the lower extremities is 5/5. . . .

OBJECTIVE STUDIES:  I did review an MRI scan of his lumbar spine obtained August 2003. . . .

IMPRESSION:  Lumbar spondylosis with lateral recess stenosis and radicular pain.

PLAN/RECOMMENDATIONS:  I discussed the diagnosis and treatment options with the patient.  I told him that we could continue to try medical management, including physical therapy, epidural steroid injections, and medications, versus surgical decompression. The patient is not sure how he wants to proceed at this time and states that he will take time to think about it and get back in touch with me.

(Tr. at 378-379).

On May 6, 2004, plaintiff saw Dr. Downing for a follow up on his rash (Tr. at 343-345, 385, 408-410).  He reported that he still had back pain.  "Patient has opted for medical management at this time, has tried physical therapy but it did not help. . . . Has not been checking blood pressure at home. . . .  States that blood sugars are bad and usually greater than 200. . . . Has claudication but not walking regularly. . . .  Patient feels depressed."  Dr. Downing noted plaintiff's long history of alcohol abuse but said he had been sober for four years.  He continued to smoke one pack of cigarettes per day.  His blood pressure was 151/86, his blood sugar was 213, his triglycerides

42

were 285, HDL was 28, and LDL was 136. He had no edema in his extremities. Assessment: "diabetes mellitus type 2 with continued poor control. . . . Patient knows that he needs to be more compliant with diet and try to exercise more. . . . Atherosclerotic coronary artery disease stable on current meds. . . . Peripheral vascular disease stable and improved, encouraged continued smoking cessation, patient not interested in intervention at this time; Lumbar disc disease, pain control adequate, patient currently declines other options. . . . depression, . . . will start Celexa, . . . Patient declined mental health clinic appointment."

On June 23, 2004, plaintiff saw Dr. Mohsin Hasnain in the emergency room complaining of a sore throat and cough (Tr. at 341-343, 406-407). On exam, his heart was normal, he had no ankle edema. He was assessed with acute pharyngitis. A nurse's note on this record reads, "Patient continues to wait to be seen by the physician. He has been back and forth to smoke while waiting."

On August 23, 2004, plaintiff saw Alan Helland, Chaplain, and talked about changing his major to religion "and what it might mean if he does go on into Social Work." (Tr. at 403).

On November 8, 2004, plaintiff had lab work done which showed his glucose at 272 (normal is 72-99) (Tr. at 384). His

43

Alc was 12.9% (see footnote four, normal for a diabetic adult is 7.0% or less) (Tr. at 394). He also had a test done which determined that he has claudication (Tr. at 392-394). Plaintiff was encouraged by Alice Archuleta, R.N., to stop smoking. That same day, he saw Dr. Downing for a follow up (Tr. at 395-396). Plaintiff had no concerns but he had been seen in the emergency room with a mallolar ulcer. "Was to have follow up in Dermatology, but patient did not keep appointment or reschedule. Has no pain associated with this. Has some edema in this extremity. States that he has ben taking meds as ordered but most meds including diabetes mellitus meds have not been ordered since 3/04. Patient states that he has not been checking blood sugar and has been non-compliant with eating well. Patient has been checking blood pressure and states most are 135/70's." Plaintiff continued to smoke a pack of cigarettes per day. He had 2+ edema. Dr. Downing assessed diabetes with continued poor control, "suspect medication noncompliance"; atherosclerotic coronary artery disease, stable on current meds and start lasix (a diuretic) for edema; hyperlipidemia, "patient needs to be more compliant with diet and exercise"; hypertension, poor control, "several meds have not been ordered for some time. Patient again instructed in importance of compliance"; peripheral vascular disease, which appeared worse and with an ulcer; lumbar disc

44

disease, "pain control adequate, patient currently declines other options"; and depression, "patient does not see much benefit with Celexa, will try to increase dose, declined mental health clinic appointment."

On November 15, 2004, plaintiff saw Kathy A. Lee, "Red Team Care Coordinator" (Tr. at 390-391. She observed minimal lower extremity edema. "Discussed with patient importance of smoking cessation."

On March 8, 2005, plaintiff saw Dr. Downing for a follow up (Tr. at 387-388, 421-423). She noted that he continued to do poorly with diabetes control, plaintiff reported his blood sugars were greater than 300, he had been having excessive thirst and urination as well as mild weight loss. He had no chest pain, "edema better with lasix". Plaintiff's depression had improved, he continued to smoke but had decreased to less than a pack per day. She observed 2+ edema. He had lab work done (Tr. at 384). His blood sugar was 287 (normal is 72-99), cholesterol was 202 (normal is below 200), his HDL was 81 (normal is above 40), his LDL was 110 (normal is below 100), and his triglycerides were 307 (normal is below 150). Dr. Downing assessed diabetes with continued poor control. She put plaintiff on insulin. She also assessed hyperlipidemia [high blood fat such as cholesterol and triglycerides], with poor control; hypertension, poor control,

45

"several meds have not been ordered for some time.  Patient again instructed in importance of compliance."  She assessed peripheral vascular disease which had gotten worse, "advised to stop smoking and encouraged continued ambulation"; lumbar disc disease, pain control adequate; and depression, stable at this time.

On April 28, 2005, plaintiff saw R. M. Newton, Ph.D., of Columbia Psychological Services at the request of Disability Determinations (Tr. at 433-440).

> In addition to the referral letter, a substantial background history was submitted primarily from the VA Medical Center in Columbia primarily related to the claimant's heart condition; however, the claimant has also been evaluated by an orthopod, Dr. Garth Russell, apparently associated with a lawsuit.  He is considered to have some problems with his spine, the result of a motor vehicle accident in 2002. . . . Claimant has also been evaluated by Dr. Carr in Jeff City, and is considered to have some lifting and other restrictions.

> BEHAVIORAL OBSERVATIONS
> . . . Upon arriving Mr. Sims remarked, "I think I know you from somewhere" and in a very friendly way we determined that Mr. Sims was in alcohol rehab at VAMC in Columbia when I was program director.  This apparently was in 1988.  He has also been treated in 1998 after my retirement.  Our interactions were friendly and cooperative.  The claimant presents and identifies himself with a valid, current driver's license. . . .

> . . . He is jovial, verbal with good eye contact, expressive and a good historian.  His thought processes are logical and coherent.  He sat comfortably and attended carefully.  He is free of abnormalities of ambulation, perception, or speech. . . . claimant is well aware of the strong association between alcohol dependence and depression, and attributes depression to that phenomenon.

46

Currently, the claimant describes his moods as somewhat "blah". He had some lows. . . . He is not sure regarding his future and doubts he'll live much longer. Again he recites his list of medical problems.

CURRENT ACTIVITIES OF DAILY LIVING
Claimant lives at the 31st Day facility, which he manages, but he labels himself "homeless". Some years back he helped start the 31st Day facility in Columbia, which is a residence for homeless veterans, some sort of non-profit agency. He lives there with fourteen other men. He has lived there since 2001. In exchange for his management, he receives free residence. He also receives a non-service connected pension from the VA of $846 a month, based upon unemployability. Claimant helps cook some of the household meals, sometimes spaghetti, but they eat lots of TV dinners. All help with the household chores. Claimant does most of the managing, collects rent, etc. . . . He continues to smoke, but reduced amounts. He does drive and transported himself to the interview, but he does not own an automobile. . . .

Claimant is enrolled at Columbia College full time. He has been continuously enrolled there for several semesters. He attends class about two hours at a time, about eight overall per week and is considered to be full time. His GPA is about a C average. He is majoring in sociology. He is funded by VR Services. . . .

PERTINENT PSYCHOSOCIAL HISTORY
. . . He did however graduate from high school in 1967 and has no additional education until recently. He had additional training and obtained minimal hours, about 75 under the GI bill. He currently has about 90 hours toward a degree as described above.

Claimant's work history includes being in the Navy about six months. He had some sort of honorable, non-medical discharge. He subsequently worked at Riback's Plumbing Supply from 1970 to 1988, but drinking interfered. He was fired. He worked at Sears for six to seven years; again drinking interfered in 1993. He has since worked in wholesale plumbing, which was interrupted by quadruple bypass. He has done some miscellaneous work since 1996, and received treatment again in 1998. Most recently claimant worked in compensated work at the VA for about a year and a

47

half.  He has done some collections work for about a year,
and sold cars for about a year for Perry's.  There he was
unable to stand on his feet all day.  He is not looking for
work, occupied as described above. . . .

His marital history was eighteen years with two children,
divorced due to alcohol.  His second wife of six years is
deceased.

DIAGNOSTIC IMPRESSIONS
Axis I:    Alcohol dependence, severe in sustained full
           remission by report
           Depressive disorder not otherwise specified
           (treated)
Axis II:   No diagnosis
Axis III:  Pain disorder associated with orthopedic problems
Axis IV:   Phase of life problems
Axis V:    GAF 60[19]

CONCLUSIONS:
1.  Mr. Sims complains of some sadness, which however does
    not appear to affect his daily functioning. . . .  He
    has also asked his physician whether or not he could
    play some volleyball.  Again his physician recommended
    that he not due to his heart condition.  These desires
    are not consistent with a diagnosis of major
    depression, nor is the claimant's clinical
    presentation, nor is any suggestion of mood problems
    evident within the medical record.
2.  Claimant is a capable man who is successfully attending
    school full time, a work-like activity.  He has been
    successful there and anticipates doing so in the
    future.  Any limitations, which he would have, would be
    based solely upon his physical problems, which I am not
    qualified to evaluate.

---

[19]A global assessment of functioning of 51 to 60 means
moderate symptoms (e.g., flat affect and circumstantial speech,
occasional panic attacks) or moderate difficulty in social,
occupational, or school functioning (e.g., few friends, conflicts
with peers or co-workers).  A global assessment of functioning of
61 to 70 means some mild symptoms (e.g., depressed mood and mild
insomnia) or some difficulty in social, occupational, or school
functioning (e.g., occasional truancy, or theft within the
household), but generally functioning pretty well, has some
meaningful interpersonal relationships.

48

(Tr. at 433-440).

Dr. Newton completed a Medical Source Statement of Ability to Work Related Activities (Mental) finding that plaintiff's ability to understand, remember, and carry out instructions was not affected by a mental impairment; his ability to respond appropriately to supervision, co-workers, and work pressures was not affected by any mental impairment; and that no other capabilities were affected by a mental impairment (Tr. at 438-440).

## V.    FINDINGS OF THE ALJ

Administrative Law Judge James B. Griffith entered his opinion on November 18, 2005.  He found that plaintiff was last insured on December 31, 2004 (Tr. at 263-264).

Step one.  The ALJ found that plaintiff had not engaged in substantial gainful activity since his alleged onset date (Tr. at 264).

Step two.  The ALJ found that plaintiff suffered from atherosclerotic coronary artery heart disease, peripheral vascular disease, degenerative disc disease, and diabetes mellitus, severe impairments (Tr. at 264).  He found that plaintiff's scarred liver is not a severe impairment as it is not a medically determinable impairment (Tr. at 264).  He found that plaintiff's hypertension is not a severe impairment because it

49

was controlled with medication (Tr. at 264). He found that plaintiff's visual impairment was not severe because his visual acuity was 20/20 both with and without glasses (Tr. at 264). He found that plaintiff's depression was not severe because the record showed no mental health treatment other than Celexa, and medical experts have determined that plaintiff has no mental impairment (Tr. at 264).

Step three. Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 3).

Step four. The ALJ found that plaintiff's subjective complaints are not entirely credible (Tr. at 267-268). He found that plaintiff retained the residual functional capacity to lift or carry ten pounds occasionally; sit for six hours; stand or walk for two hours; could less than occasionally stoop, crouch, kneel, or climb ramps or stairs; could never crawl or climb ladders or scaffolds; and should avoid even moderate exposure to hazards, fumes, dust, gases, and smoke (Tr. at 268). With this residual functional capacity, plaintiff cannot return to his past relevant work as a sales representative, debt collector, or pastoral assistant (Tr. at 268).

Step five. Plaintiff can work as a skip tracer, with 20,000 jobs in the country; a semi-skilled sedentary civil service clerk, with 100,000 jobs in the country; or a semi-skilled

50

sedentary throw-out clerk, with 20,000 jobs in the country (Tr. at 269).  Therefore, plaintiff was found not disabled at the fifth step of the sequential analysis.

## VI.  *CREDIBILITY OF PLAINTIFF*

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony regarding his lower-leg swelling was not credible.

### A.  *CONSIDERATION OF RELEVANT FACTORS*

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts.  Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987).  If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints.  Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993).  The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions.  Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992).  If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole.  Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion, and additionally states that the following factors should be considered: Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; and any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board).

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are as follows:

52

[T]he claimant lacks credibility. As for daily activities, the claimant attended college during the period in question, his major course of study being sociology. Learning a vocation is inconsistent with a genuine belief of disability.

Regarding duration of symptoms, the claimant has experienced lower extremity edema since undergoing the 1994 procedure. Absent objective medical evidence of deterioration, of which there is none, this symptom cannot reasonably be considered disabling when the claimant worked for years in spite of it, some of the work involving standing or walking seven to eight hours a day.

With respect to intensity and frequency of symptoms, the claimant asserted that he has been unable to walk long distances, but cardiac rehabilitation records show he could walk on a treadmill for thirty minutes without significant discomfort. What's more, the medical record shows that the claimant <u>needs</u> to walk regularly because of his peripheral vascular disease. The claimant asserted that leg pain has been constant, but he conceded that swelling does not occur until he stands more than an hour. The claimant also conceded that he has only had to use nitroglycerin three or four times a month and that the medication had provided relief within minutes. Although the claimant rated his back pain as a 5 to 6 on a scale of 1 to 10 (high), he repeatedly informed the VA that pain control was adequate. He also admitted that Ibuprofen, an analgesic that can be obtained over the counter, provided relief, and the declined treatment other than medication for his spinal condition. Furthermore, Dr. Russell could not confirm that spinal surgery was necessary. And the claimant did not start taking insulin until after his date last insured. Thus, the implication is that symptoms were not so intense or frequent as to be disabling.

The only aggravating factors indicated by the record are the claimant's poor compliance with his diabetic regimen and the smoking of tobacco, the latter exacerbating the claimant's peripheral vascular disease. This weighs against the claimant because of the self-infliction of symptoms it represents.

Regarding treating other than medication, the claimant asserted that he has generally had to lie down and prop up

Case 2:07-cv-04085-REL   Document 13   Filed 06/13/08   Page 53 of 66

his left leg several times a day, for as long as two hours at a time. However, this assertion is suspect because the medical record often shows the claimant had minimal or no edema.

(Tr. at 267-268).

## 1.  *PRIOR WORK RECORD*

Plaintiff's earnings are fairly stable with the exception of no earnings posted for 1997 or 1998, relatively low earnings in 1999, and of course beginning in 2001 when he stopped working his earnings went from little to none. The low or no earnings, however, correlate with plaintiff's alcohol problems, not with his impairments. For example, he had a heart attack with bypass surgery in July 1994, yet he earned $24,329.34 in 1994. He testified that he was fired in 1988 due to alcohol, and in that year his earnings dipped to $4,447.07. He sought alcohol treatment in 1998, and he had no earnings that year or the year before.

Plaintiff's alleged onset date correlates with the date he was fired from his last job. He applied for unemployment benefits and received those benefits for about six months, all the while looking for work and certifying that he was willing and able to work. This is inconsistent with his allegation that during the same time he was unable to perform any job in the national economy.

54

## 2. *DAILY ACTIVITIES*

The record establishes that plaintiff is able to cook and do his own laundry.  After his alleged onset of disability, he drove himself to Kansas City to visit a friend (in the fall of 2001, shortly after his second heart attack) and then back to Columbia, and he was driving in Kansas City again in February 2002 when he had his car accident.  In January 2002, again after his alleged onset date, he told Dr. Higdon that he was going to Florida with a woman friend and they would be "quite busy."  He told Mark Nunn he would be out of town January 25, 2002, a Friday.  In March 2003, plaintiff told Dr. Russell he had had to give up playing golf due to discomfort from a car accident he was in almost a year after his alleged onset date.  Plaintiff is able to attend college full time and has accumulated 90 credit hours.  One factor in deciding a claimant's residual functional capacity to perform full-time work is his ability to successfully complete college courses.  See House v. Shalala, 34 F.3d 691, 693-94 (8th Cir. 1994); Grace v. Sullivan, 901 F.2d 660, 661-62 (8th Cir. 1990).

Although plaintiff testified that he was able to live free in a homeless veteran's home as long as he liked, he told Dr. Newton that he was able to live there free in exchange for managing the place.  His duties included collecting rent from the

other residents, making it clear that plaintiff's free room was based solely on his work as a manager.

Plaintiff's daily activities are inconsistent with his allegation of total disability.

**3. _DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS_**

Plaintiff testified that he takes nitroglycerin and lies down for a couple of hours due to chest pain several times per month, and that he lies down or props his legs up every few hours for an hour or two every day due to leg swelling. These allegations are not supported by the medical records.

Edema:

The medical records establish that plaintiff did have swelling in his legs on occasion, but for the most part his treating doctors noted no edema:

02/20/2001 - edema in left leg, plaintiff claimed it had been present since his bypass which occurred in 1994, about 6 1/2 years earlier.

07/20/2001 - 2+ edema of the left leg, none on the right. This was shortly before plaintiff's heart attack.

08/03/2001 - no swelling in plaintiff's extremities.

08/15/2001 - no swelling in plaintiff's extremities.

11/18/2001 - no pedal edema.

02/07/2002 - no edema in plaintiff's extremities.

56

10/26/2002 - no edema.

11/02/2002 - although plaintiff complained of chronic edema, Dr. Downing noted no edema.

01/12/2003 - no edema.

03/12/2003 - he does have swelling in his left lower extremity.

07/11/2003 - no leg swelling.

10/31/2003 - no edema.

05/06/2004 - no edema.

06/23/2004 - no ankle edema.

11/15/2004 - a Red Team Care Coordinator observed minimal lower extremity edema.

The medical records simply do not support plaintiff's claim that his daily activities are so severely restricted due to leg swelling.  In addition, Dr. Downing noted on March 8, 2005, that plaintiff's edema was better with Lasix, a diuretic.

Chest pain:

The medical records establish that plaintiff experienced chest pain when he was admitted to ICU after suffering a heart attack.  Other than that time, plaintiff consistently reported no chest pain:

08/15/2001 - no further episodes of chest pain since heart attack.

57

11/08/2001 - no chest pain.

06/13/2002 - plaintiff reported persistent episodes of chest pain to a doctor he saw at the request of his disability attorney in connection with his disability claim.

11/12/2002 - no chest pain.

10/31/2003 - no chest pain.

03/29/2004 - no chest pain.

03/08/2005 - no chest pain.

Again, the records reflect that plaintiff consistently reported no chest pain to his treating doctors. The only time he complained to a doctor of chest pain was not for treatment, but for evaluation in connection with his disability claim.

Plaintiff reported consistently that his edema had been present since his bypass surgery in July 1994 -- more than six years before his alleged onset date. Plaintiff was clearly able to work with the leg swelling for a long time before applying for disability benefits, suggesting that although it may be present, it does not affect his abilities to the extent he claims.

Plaintiff reported on February 7, 2002, that he had been doing well and was walking 30 minutes on the treadmill without any significant discomfort. Therefore, even though he complained of leg discomfort during rehab, that pain resolved within a few

minutes and was described by plaintiff's doctor as being insignificant.

On March 12, 2003, plaintiff told Dr. Russell that he "was well until February 23, 2002" when he had a car accident.  This was almost a year after his alleged onset date.

Plaintiff consistently took very mild medication (usually just over-the-count Ibuprofen) for his pain and specifically said he did not want narcotics for his leg and back pain.  However, when he hurt his ear with a pen cap, he requested narcotics.  This suggests that plaintiff's leg and back pain were quite mild.  In fact, on October 31, 2003, plaintiff told Dr. Downing that his back pain was manageable as long as he restricted his activity.

On May 6, 2004, plaintiff's treating physician noted that the pain caused by plaintiff's lumbar disc disease was adequately controlled and plaintiff declined any further options.  She also noted that he declined a mental health clinic appointment, suggesting that his depression was adequately controlled.  Plaintiff told Dr. Downing on November 8, 2004, that his back pain was adequately controlled and he declined other options, and he again declined a mental health clinic appointment.

When plaintiff was seeing a psychologist, he sat comfortably; however, he sat stiffly when he was seeing a doctor

59

evaluating his physical impairments, suggesting that he may have been exaggerating his symptoms at times.

Based on all of the above, I find that this factor clearly supports the ALJ's finding that plaintiff's allegations are not entirely credible.

**4.   *PRECIPITATING AND AGGRAVATING FACTORS***

Clearly the greatest aggravating factor is plaintiff's smoking.  He testified that at the time of the November 1, 2002, hearing, he was smoking one cigarette every couple of days. However, the medical records establish that on May 12, 2002, he was smoking 1/2 pack per day; on June 13, 2002, he was smoking 1/2 to one pack per day; on November 12, 2002, he had decreased to a few cigarettes per day, and by January 12, 2003 -- just two months later, he was back up to 1 1/2 packs per day.  On May 12, 2002, Dr. Downing told plaintiff that his smoking continued to contribute to the claudication problem in his legs.  Despite having testified that his swollen legs cause him to be disabled, he has continued to smoke heavily year after year despite being told this is causing a lot of his problem.

Plaintiff testified that his legs swell because he had veins removed from his legs for his heart surgery.  However, that occurred in 1994, almost seven years before his alleged onset date.

Case 2:07-cv-04085-REL   Document 13   Filed 06/13/08   Page 60 of 66

Plaintiff has blamed his lack of exercise on his lower back pain (which the medical records establish is controlled by over-the-counter medication), by physical therapy, and by his lower leg pain and swelling. However, the medical records establish that plaintiff was consistently told to exercise to improve his impairments.

Plaintiff testified that his blood sugar was still high despite his trying to exercise and change his diet; however, the record establishes that he was consistently noncompliant with diet, medication, checking his blood sugars, and exercising. In fact, Dr. Downing noted in February 2001 that plaintiff's blood sugar runs around 120 when he takes his medication, but on that visit when he had been out of his medicine his blood sugar was 412.

Plaintiff's cardiac rehab consistently showed that he was able to walk on the treadmill, ride an exercise bike, and walk on a track with only minimal leg and hip pain that did not interfere with exercising and resolved after just a few minutes.

This factor supports the ALJ's finding that plaintiff's allegations are not entirely credible.

**5.    *DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION***

Plaintiff testified that he experiences some nausea and some lightheadedness due to his medications; however, there is not one

Case 2:07-cv-04085-REL   Document 13   Filed 06/13/08   Page 61 of 66

complaint of these side effects in the medical records.

The records establish that plaintiff's leg and back pain were consistently treated with over-the-counter Ibuprofen, although he normally took larger than the normal dosage. Plaintiff repeatedly described his pain as manageable with his current medications. By March 2004, three years after his alleged onset date, plaintiff's treatment for back pain consisted of Ibuprofen and physical therapy. Plaintiff has never been on strong pain medications, his doctors have not recommended surgery, and he has consistently reported adequate pain control. This factor support's the ALJ's credibility finding.

## 6. *FUNCTIONAL RESTRICTIONS*

Plaintiff testified that he could stand for about 20 minutes at a time and sit with both feet on the floor for about 45 minutes to an hour. However, plaintiff was able to walk on a treadmill for 30 minutes and follow that with walking laps on a track without difficulty, suggesting that he is exaggerating his standing limitations. Additionally, he was able to drive to Kansas City from Columbia and either drive or fly to Florida, suggesting that he is exaggerating his sitting limitations.

Plaintiff testified that he can no longer do his previous sit-down job because he was not permitted to get up during the day. However, the ALJ's RFC and hypothetical to the vocational

62

expert included normal breaks and the ability to stand up every hour to stretch.

Plaintiff testified that he lost his job in March 2001 because he could not stand or walk due to the swelling in his legs. However, he has failed to explain how he was able to work for six and a half years after the surgery, especially since there is nothing in the medical records suggesting that plaintiff's leg problem worsened about the time he stopped working.

Plaintiff testified that he has to go to the bathroom every 30 to 45 minutes due to his diabetes. However, the medical records establish that plaintiff did not complain of frequent urination until March 8, 2005, after he had been put on a diuretic. Additionally, plaintiff's diabetes is uncontrolled due to his own noncompliance.

There are almost no functional restrictions in the record. On August 3, 2001, three days after his most recent heart attack, plaintiff was told by Dr. Trotman to consult his primary care physician before over exerting himself. However, the remaining records contain myriad directives to exercise: Carrie Pie, R.N., recommended on September 18, 2001, that plaintiff exercise for 30 minutes every day; on November 8, 2001, Dr. Downing told plaintiff he needs to continue exercising in order to improve his

63

circulation to his lower extremities; on February 7, 2002, Dr. Bedi encouraged regularly exercise; on May 15, 2002, Dr. Downing encouraged plaintiff to continue an exercise program; on May 6, 2004, Dr. Downing told plaintiff to try to exercise more; on May 8, 2005, Dr. Downing advised plaintiff to continue ambulation.

In fact, plaintiff was consistently able to walk on the treadmill for 20 to 30 minutes followed by using an exercise bike and walking a track during his cardiac rehab.

This factor supports the ALJ's credibility conclusion.

**B.   *CREDIBILITY CONCLUSION***

In addition to the above factors, I note here that plaintiff has been extremely noncompliant with treatment.  He has been repeatedly advised of the importance of stopping smoking, yet he continued to smoke heavily over the years.  He waited to see a doctor for a sore throat and cough by walking in and out of the building smoking cigarettes.  He failed to show for all but one appointment with Dr. Higdon whom he was seeing to help him stop smoking.  And he testified that it wasn't that he could not quit, it was that he would not quit.

Plaintiff failed to attend several sessions of cardiac rehabilitation due to personal conflicts with scheduling (and there were no other medical records during that time period) suggesting that his daily activities are more involved than he

claims.  He has consistently failed to monitor his blood sugar, take his medication as prescribed, exercise, and adhere to a low fat, controlled carb diet.  He was not doing his home exercises properly for back pain, and he left his appointment early when he was supposed to be fitted with a lumbosacral corset, again suggesting his personal life is busier than he claims and that his back pain is milder than he claims.  He failed to show for appointments with dermatologists or to reschedule despite having lesions on his legs from uncontrolled diabetes.

When an impairment can be controlled by treatment or medication, it cannot be considered disabling.  Wheeler v. Apfel, 224 F.3d 891 (8th Cir. 2000); Kisling v. Chater, 105 F.3d 1255 (8th Cir. 1997).  Failure to follow a prescribed course of remedial treatment without good reason is grounds for denying an application for benefits. Id.; 20 C.F.R. § 416.930(b).

Not only has plaintiff failed to follow a prescribed course of remedial treatment without good reason, the record establishes that despite his impairments he is still able to perform jobs that exist in significant numbers in the national and local economies.  Therefore, plaintiff's motion for summary judgment will be denied.

Case 2:07-cv-04085-REL   Document 13   Filed 06/13/08   Page 65 of 66

## VII. CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff was not disabled through his last insured date. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.


_/s/ Robert E. Larsen_
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
June 13, 2008

Case 2:07-cv-04085-REL   Document 13   Filed 06/13/08   Page 66 of 66